******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AJJ ENTERPRISES, LLP *v.* HERNS
JEAN-CHARLES ET AL.
(AC 36838)

Sheldon, Keller and Mullins, Js.

*Argued April 16—officially released October 13, 2015*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Genuario, J.)

*Ryan P. Driscoll*, with whom, on the brief, was *Richard J. Buturla*, for the appellant-appellee (plaintiff).

*Peter A. Ventre*, for the appellee-appellant (substitute defendant).

*Opinion*

MULLINS, J. This case concerns the trial court's application of the doctrine of equitable subrogation to reorder the priorities of interest of existing liens on a residential property. The plaintiff, AJJ Enterprises, LLP, appeals from the judgment of the trial court, rendered in favor of the substitute defendant, the Bank of New York Mellon, as trustee for the Amortizing Residential Collateral Trust, mortgage pass-through certificates, series 2002-BC7 (defendant bank),[1] reordering the priorities of interest of the mortgages on a piece of residential property located at 10 Carlin Street, Norwalk, and ordering a strict foreclosure with respect to that property.

On appeal, the plaintiff claims that the court erred in: (1) reordering the priority of interest, by applying the doctrine of equitable subrogation, despite the defendant bank having had constructive notice of the plaintiff's properly recorded mortgage on 10 Carlin Street, (2) reducing the amount of the lien held by the plaintiff on the basis of its conclusion that there was a value to a quitclaim deed, previously held by the plaintiff, for commercial property located at 18 Monroe Street, Norwalk, and (3) assigning a value to 18 Monroe Street for 2005 despite the fact that there was no evidence to support such a valuation.

The defendant bank has filed a cross appeal in which it claims that the court erred in rendering a judgment of strict foreclosure in favor of the plaintiff because the plaintiff failed to prove its debt as part of its case-in-chief. The defendant bank requests that we consider its cross appeal only in the alternative, and, specifically, only if we agree with the plaintiff and reverse the court's judgment applying the doctrine of equitable subrogation. We affirm the judgment of the court. Accordingly, we do not address the defendant bank's cross appeal.

The following complicated and detailed facts, as set forth by the trial court in its memorandum of decision, and as supplemented by the record, inform our review. "The plaintiff was created in 1997 for the primary purpose of acquiring and holding real estate for investment. The plaintiff consists of two equal partners, Alfonse Pascarelli, Jr. (Pascarelli), and Edward Bartolo (Bartolo).[2] . . . One of the properties that the plaintiff owned was known generally as 18 Monroe Street, Norwalk . . . . [The] 18 Monroe Street [property] is a mixed use property located in South Norwalk . . . . It consists of several retail units on the first floor and multiple residential units above the first floor. . . .

"In 1999 or 2000 the defendant Jean-Charles, who owned a taxi company, approached Pascarelli concerning rental of portions of the retail space at 18 Monroe Street for his business. The plaintiff and the defendant Jean-Charles reached a rental agreement and the defendant Jean-Charles became a retail tenant of the plaintiff

at 18 Monroe Street. . . . For a variety of reasons, the plaintiff became interested in selling the 18 Monroe Street property[3] and eventually came to an agreement with the defendant Jean-Charles for the sale and purchase of 18 Monroe Street for a price of $675,000, despite the fact that the defendant Jean-Charles had no available cash for a down payment on the property or even for closing costs involved in the sale and purchase transaction. . . .

"The plaintiff and the defendant Jean-Charles executed a contract for the sale and purchase of 18 Monroe Street in April, 2002. The contract called for a sale price of $675,000. The obligations of the defendant Jean-Charles under the contract were contingent [on] his ability to obtain a mortgage commitment in the amount of $500,000. Because the defendant Jean-Charles had no cash available to engage in the transaction, the contract called for the balance of the purchase price, $175,000, to be paid by a promissory note from the buyer to the seller with a 'blanket mortgage on properties that he owns.' At the time, the defendant Jean-Charles owned 10 Carlin Street. This promissory note was also to include 'actual closing costs to seller.' The seller/plaintiff paid for all of the costs of the closing including those [that] would typically be borne by the buyer. . . .

"The defendant Jean-Charles was able to secure a mortgage commitment from First County Bank in the amount of $500,000, but only if the [defendant Jean-Charles'] debt to First County Bank was guaranteed by Pascarelli and Bartolo. Nothing in the [plaintiff's] contract [with the defendant Jean-Charles] obligated Pascarelli and Bartolo to guarantee the repayment of the mortgage note. . . . Because they wanted to sell the property, Pascarelli and Bartolo agreed to and did guarantee the . . . $500,000 note to First County Bank, even though they were not obligated to do so by the original contract. . . .

"The closing of the transaction for the sale and purchase of 18 Monroe Street occurred on May 24, 2002. The defendant Jean-Charles formed a limited liability company, Jean-Charles Enterprises, LLC (JCE), for the purpose of taking title to 18 Monroe Street [and the defendant Jean-Charles signed the note and mortgage on behalf of JCE)].[4] At the closing, a promissory note in the face amount of $195,000 was executed by the defendant Jean-Charles, JCE and Regina F. Jean-Charles (Regina), the defendant Jean-Charles' wife: The plaintiff/seller paid all of the closing costs at the closing, and the amount of the promissory note ($195,000) was consistent with the intent of the contract and the consideration rendered in exchange for the promissory note. At the time of the execution of the note, the defendant Jean-Charles and the other makers became indebted to the plaintiff in the amount of $195,000. . . .

"The following documents were also executed at the

closing on May 24, 2002:

"a. A warranty deed from Pascarelli and Bartolo to JCE;[5]

"b. A promissory note from JCE to First County Bank in the face amount of $500,000;

"c. A mortgage from JCE to First County Bank encumbering 18 Monroe Street;

"d. A promissory note payable to the plaintiff in the principal amount of $195,000 signed by JCE, the defendant Jean-Charles, and Regina;[6]

"e. A mortgage to the plaintiff securing the $195,000 promissory note encumbering 18 Monroe Street signed by JCE;

"f. A mortgage to the plaintiff securing the $195,000 note encumbering 10 Carlin Street signed by the defendant Jean-Charles;

"g. A quitclaim deed from JCE to the plaintiff conveying 18 Monroe Street to the plaintiff;

"h. An escrow agreement [between the plaintiff and JCE,] which called for the quitclaim deed to be held by Attorney Nathaniel Shipp but which was to be delivered to either Pascarelli or Bartolo in the event of default on the $195,000 promissory note.[7] The quitclaim deed was delivered to Attorney Shipp at the closing and remained in his possession until October 4, 2005.[8] . . .

"All parties were represented at the closing. First County Bank, JCE, the defendant Jean-Charles and Regina were all represented by Attorney Nathaniel Shipp. The plaintiff, Pascarelli, and Bartolo were all represented by the law firm of Modugno, Modugno and Modugno. . . . Just as the [purchase and sale agreement] did not require Pascarelli and Bartolo to guarantee the $500,000 note to First County Bank, nothing in the original contract required the execution of a quitclaim deed and escrow agreement. . . . [T]he quitclaim deed and escrow agreement were additional consideration and security that the [plaintiff] required as a result of [Pascarelli's and Barolo's] willingness to guarantee the $500,000 promissory note . . . .

"The mortgage from the defendant Jean-Charles to the plaintiff encumbering 10 Carlin Street was duly recorded in the Norwalk land records on May 24, 2002, at 3:54 p.m. The warranty deed from Pascarelli and Bartolo to JCE conveying 18 Monroe Street was duly recorded in the Norwalk land records on May 28, 2002, at 3:49 p.m.; the mortgage from JCE to First County Bank encumbering 18 Monroe Street was duly recorded in the Norwalk land records on May 28, 2002, at 3:50 p.m., and the mortgage from JCE to [the] plaintiff encumbering 18 Monroe Street was duly recorded in the Norwalk land records on May 28, 2002, at 3:51 p.m. . . . The mortgage from JCE to the plaintiff encumber-

ing 18 Monroe Street was recorded subsequent to the First County Bank mortgage and was expressly made subordinate to the mortgage to First County Bank.

"While the plaintiff did not have a title search done on 10 Carlin Street, Pascarelli believed that the mortgage on 10 Carlin Street was a second mortgage. The promissory note that it encumbers states that it is 'secured by a second mortgage on real property known as 18 Monroe Street, Norwalk, CT 06854 and 10 Carlin Street, Norwalk, CT 06851.' . . . In fact, at the time the mortgage from the defendant Jean-Charles to the plaintiff was recorded, it was subsequent to two mortgages that encumbered 10 Carlin Street, a first mortgage in the face amount of $288,000 and a second mortgage in the face amount of $30,300. . . .

"Accordingly, at the conclusion of the 18 Monroe Street closing, record title to 18 Monroe Street was held by JCE encumbered by a first mortgage to First County Bank in the face amount of $500,000 and a second mortgage to the plaintiff in the face amount of $195,000; record title to 10 Carlin Street was held by the defendant Jean-Charles encumbered by a first mortgage to GMC Mortgage, Inc., in the face amount of $288,000, a second mortgage to First Union National Bank in the face amount of $30,300 and, subsequent to these two mortgages, the mortgage from the defendant Jean-Charles to the plaintiff in the amount of $195,000. . . .

"Around the time that the defendant Jean-Charles was engaged in this transaction with the plaintiff, he was also seeking to refinance the first and second mortgage on the 10 Carlin Street property. On May 16, 2002, counsel for the proposed new lender ordered a title search on 10 Carlin Street, which search was done [on] May 20, 2002, at 10:30 a.m. Of course, the search revealed only the first and second mortgages on 10 Carlin Street previously described and did not and could not have revealed the third mortgage to the plaintiff because, as of May 20, 2002, it had not been executed or recorded.

"On or about June 8, 2002, the defendant Jean-Charles closed his refinance [transaction] with the defendant bank's predecessor in interest, Aeges Mortgage Corp[oration] (Aeges). Aeges lent the defendant Jean-Charles $348,000. Those funds were utilized to satisfy the first mortgage on 10 Carlin Street in the amount of $287,922.40 and to satisfy the second mortgage on 10 Carlin Street in the amount of $26,234.09. The balance of the loan proceeds were utilized to pay transactional costs in the amount of $19,837.40 as well as other creditors of the defendant Jean-Charles, which creditors did not encumber the 10 Carlin Street property. The balance of the proceeds in the amount of $3614 was paid to the defendant Jean-Charles.

"The mortgage from the defendant Jean-Charles to

Aeges was recorded on June 11, 2002, which, of course, was subsequent to the recording of the mortgage from the defendant Jean-Charles to the plaintiff. Though the individual who recorded the mortgage was instructed to search the title of the 10 Carlin Street property from the date of the previous search (May 20, 2002) to the time of the recording of the Aeges mortgage, he did not discover the mortgage from the defendant Jean-Charles to the plaintiff encumbering 10 Carlin Street that had been recorded on May 24, 2002.

"Since the first and second mortgage, which had previously encumbered 10 Carlin Street were satisfied and released, the plaintiff's mortgage became the first mortgage in time, and the Aeges mortgage became the second mortgage in time. Through a series of duly executed transactions, the defendant bank became the owner of the Aeges mortgage and the holder of the Aeges note [that] it secured. The [true] state of record title on 10 Carlin Street was not discovered by either [the] plaintiff or the defendant bank's predecessors until the defendant Jean-Charles fell into default and an action to foreclose the Aeges mortgage was begun. . . .

"[After] [t]he defendant Jean-Charles defaulted on the Aeges note, the First County note and the plaintiff's note . . . First County commenced a foreclosure of its first mortgage on 18 Monroe Street.[9] The plaintiff, as a subsequent encumbrancer, was made a defendant in that action. Pascarelli and Bartolo, as guarantors of the First County note, were also made defendants in that action and had exposure to First County Bank as a result [of] the guarantees that they had executed when the loan was closed. . . .

"Aeges Mortgage Company, through its nominees, [also] began a foreclosure action on 10 Carlin Street by complaint dated March 10, 2004, which complaint named the plaintiff's mortgage as a mortgage [that] was prior in right to that of the defendant bank's predecessors. That foreclosure action was withdrawn [as were] two subsequent foreclosure actions . . . [begun] by the defendant bank's predecessors, each of which named the plaintiff herein as the defendant [and] alleg[ed] that equitable remedies should be invoked to rearrange the priority of the mortgages between the defendant bank and the plaintiff on 10 Carlin Street. None of those foreclosure actions were prosecuted to completion." (Footnotes altered.)

As the trial court further set forth in its memorandum of decision, the plaintiff commenced the present action, by service of process in April, 2005, "to foreclose a mortgage granted to it by the defendant Jean-Charles on his residential property known generally as 10 Carlin Street. . . . The plaintiff alleges, in one count, that the defendant Jean-Charles granted to it a mortgage on 10 Carlin Street to secure a note in the principal amount of $195,000, and that the note is in default. The complaint

further alleges that the various defendants claim an interest in the property, which interests, including that of the defendant bank, are subsequent in right to the plaintiff's mortgage. The defendant bank has filed an answer and seven special defenses, to wit: marshaling of assets, equitable subrogation, unclean hands, failure to mitigate damages, equitable alteration of priorities, equitable estoppel, and unjust enrichment. Through its special defenses, the defendant bank seeks to invoke the court's equitable powers to cause its mortgage to obtain priority over the plaintiff's mortgage despite the fact that the plaintiff's mortgage was recorded prior to the mortgage of the defendant bank. Moreover, the defendant bank challenges whether the plaintiff has proven that it is owed money from the defendant Jean-Charles pursuant to the promissory note secured by the mortgage it seeks to foreclose."

While the present action was pending, "[o]n October 4, 2005, Pascarelli and his attorney went to Attorney Shipp's office to retrieve the quitclaim deed from JCE to the plaintiff pursuant to the escrow agreement, which entitled the plaintiff to retrieve the quitclaim deed upon the default of JCE. They successfully retrieved the quitclaim deed and recorded it in the Norwalk land records on the same day. On October 4, 2005, immediately before they recorded the quitclaim deed, they also recorded an assignment of the mortgage (from JCE to the plaintiff encumbering 18 Monroe Street, [as security for the $195,000 loan]) from the plaintiff to Pascarelli and Bartolo. . . . Notwithstanding the recording of the quitclaim deed, the plaintiff did not initially collect rents from the 18 Monroe Street tenants and did not initially interfere with JCE's possession and control of the 18 Monroe Street property. . . .

"First County Bank obtained a judgment of foreclosure by sale on the 18 Monroe Street property. As a part of that judgment, the court found the debt from JCE to First County Bank to be $465,896.58. A sale date was set for August 16, 2008. . . . On August 15, 2008, JCE filed a voluntary petition for [bankruptcy, which stayed] the sale. . . .

"On October 17, 2008, the plaintiff filed a motion for relief from the automatic stay in the bankruptcy court, which motion included a copy of the recorded quitclaim deed and asserted that JCE wrongly included 18 Monroe Street as an asset of the bankruptcy estate since JCE was not the owner of 18 Monroe Street. The plaintiff, in that motion, asserted that it was the owner of the 18 Monroe Street property by virtue of the quitclaim deed recorded on October 4, 2005. The motion included an assertion that the plaintiff 'accepted delivery of said deed' and recorded the same on October 4, 2005. The motion also included the assertion that the plaintiff 'is the owner of the premises located at 18 Monroe Street . . . and [that JCE] does not have any ownership inter-

ests in the premises.' The motion for relief from stay was granted. . . .

"On December 29, 2009, Pascarelli and Bartolo formed a new limited liability company, J.P. Asset Management, LLC (J.P. Asset).[10] They were each 50 percent owners of J.P. Asset, and J.P. Asset was created for the sole purpose of engaging in a transaction with First County Bank. On December 29, 2009, J.P. Asset paid First County Bank $400,000 in exchange for an assignment of the First County mortgage and an allonge for the First County note. . . . J.P. Asset was substituted as plaintiff in the previously initiated First County foreclosure action. J.P. Asset obtained a judgment of strict foreclosure on the 18 Monroe Street property on August 2, 2010, and title to the 18 Monroe Street property vested in J.P. Asset, and title remained in J.P. Asset at least through the trial of the case. At the time J.P. Asset acquired title through the strict foreclosure process, there was approximately $60,000 in property taxes due on the 18 Monroe Street property, which amount was prior in right to J.P. Asset's newly acquired interest."

The court set forth the following additional findings in its memorandum of decision: "[A]s of January 1, 2010, the balance due on the $195,000 note was $398,360.22. . . . The promissory note contains provisions for an increased interest rate upon default and late charges upon default . . . . [T]he debt due at the time of the trial from the defendant Jean-Charles to the plaintiff was $415,031.04. The finding of this debt, however, is subject to the significance of the quitclaim deed received and recorded by the plaintiff . . . .

"The court makes the subordinate finding that on October 4, 2005, just before the quitclaim deed was retrieved and recorded, the debt from the defendant Jean-Charles to the plaintiff was $241,246.96. The court finds that on the date of the closing in 2002, the value of the 18 Monroe Street property was $675,000. [The] court finds that on October 24, 2008, the value of the property was $668,000.

"After a review of the appraisals along with consideration of the evidence of the condition of the property the court finds that on October 4, 2005, the date that the quitclaim deed was recorded, the value of the property was $670,000. The court finds as of June 2010, the value of the property was $480,000. The dramatic difference in the value between 2008 and 2010 can be accounted for by both a deterioration of the condition of the property as well as the impact on real estate values resulting from the global financial crisis of 2008. In fact, one of the appraisers testified that the financial crisis of 2008 had a significant adverse impact on the applicable real estate property." (Emphasis omitted.)

On the basis of its findings and its review of our case law, the court determined, in its memorandum

of decision, that the doctrine of equitable subrogation should be applied in this case to reorder the priority of the liens encumbering 10 Carlin Street. Specifically, the court stated that "the plaintiff did not bargain for . . . the additional security of a first mortgage on the plaintiff's personal residence, [located at 10 Carlin Street]. The plaintiff bargained for and received a mortgage that was subsequent to two duly recorded mortgages. The fact that the plaintiff never had a title search done on 10 Carlin Street, nor had a full appraisal done on 10 Carlin Street is indicative of the fact that this particular component of the security was less important to it as a part of the overall transaction. The plaintiff is only in its position of being first in time on the 10 Carlin Street property as a result of the mistake of the defendant bank's predecessors who, in fact, did negotiate and bargain for a first mortgage position on the 10 Carlin Street property and who, in fact, gave valuable consideration to obtain it. It would not be equitable to allow the plaintiff to obtain a benefit [for] which it did not bargain . . . at the expense of the defendant bank under all of these circumstances as a result of a mistake of the defendant bank's predecessors, even a negligent mistake, particularly when the plaintiff had already obtained title to the 18 Monroe Street property and had a duly recorded second mortgage on the 18 Monroe Street property.

"Moreover, the value of the 18 Monroe Street property was $670,000 at the time that the plaintiff recorded the quitclaim deed and assigned its second mortgage to its principals. While the plaintiff argues the value of the 18 Monroe Street property was considerably less in 2005, [it] introduced no direct appraisal testimony to this effect, and the court believes that the lessening of the value of the 18 Monroe Street property occurred substantially after 2005, as a result of its continued deterioration and significant market forces that occurred in late 2008. The best evidence before the court is that the property had a value of $670,000 in 2005, and that the debt to the first mortgagee was considerably less at the same time. While neither party has introduced direct evidence of the debt due First County on October 4, 2005, the court takes judicial notice that in foreclosing the First County mortgage in 2008, the debt owed on the First County note was $465,896.58. In the absence of evidence from which the court can conclude that the debt was either reduced or increased between October 4, 2005, and the judgment in 2008, the court finds that to be the amount of the debt secured by the First County mortgage, which the plaintiff took subject to when it recorded the quitclaim deed.

"When all is said and done, the plaintiff received $500,000 cash (less closing costs) when it sold the property to the defendant Jean-Charles in [May] 2002,[11] [and] it received the property back in 2005 subject to a mortgage in the face amount of $500,000 at such time when

the property was worth approximately $670,000. The plaintiff could have foreclosed its second mortgage if it was concerned about the legitimacy of the quitclaim deed but chose not to do so. The principals of the plaintiff ultimately paid $400,000[12] to obtain an assignment of the First County mortgage to their newly organized company, J.P. Asset. J.P. Asset then foreclosed on the property and obtained title by the way of strict foreclosure. It may well be that the property is now worth substantially less than what it was worth in 2002 or 2005. The deterioration of the property and the impact of adverse market conditions while the plaintiff pursued collection activity pursuant to the instruments it had negotiated for and received does not justify allowing it to obtain [priority in its] security against 10 Carlin Street, which it did not bargain for, at the expense of the defendant bank whose predecessors did negotiate and bargain for a first position. Under these circumstances, it would be unconscionable to allow the plaintiff to enhance its position at the expense of the defendant bank.

"Accordingly the court will exercise its equitable powers to reorder the priority of the mortgages on 10 Carlin Street to the effect that the mortgage owned by the defendant bank shall be prior in right, with limitations as set forth [subsequently in this opinion] . . . .

"At the time of the closing of the defendant bank's mortgage, 10 Carlin Street was encumbered by two mortgages. The first mortgage had a face amount of $288,000, but the debt it secured had been reduced to $287,922.40, and the second mortgage had a face amount of $30,000, which secured a debt that had been reduced to $26,234.09. The defendant bank's predecessors paid $314,156.49 to obtain releases of these mortgages. At the time of the closing, the property tax obligations of the defendant Jean-Charles on the 10 Carlin Street property were current. Though the defendant bank's predecessors loaned $348,000, the plaintiff's [existing] mortgage[s] at the time of the closing . . . total[ed only] $314,156.49. The balance of the proceeds [was] used to pay transactional costs, other debts of the defendant Jean-Charles, which were not encumbrances on the property, plus a disbursement check to the defendant Jean-Charles. These additional amounts cannot be included in the amount of the defendant bank's debt insofar as the defendant bank obtains a priority position ahead of the plaintiff . . . . Accordingly, its subrogation rights are limited to $314,156.49 and amounts that may have accrued consistent with the terms of the original two mortgages. . . .

"On October 4, 2005, the debt due the plaintiff from the defendant Jean-Charles was $241,246.96. On that date the plaintiff effectively executed the self-help security provisions of the escrow agreement and the debt was reduced by the amount of value it received pursuant

to that execution. Given the [2005] value of the [18 Monroe Street] property, $670,000, and the amount of the debt secured by the [First County note], approximately $465,000, the court finds that the debt [due the plaintiff] had been reduced by $205,000 when the plaintiff retrieved and recorded the quitclaim deed. Accordingly, the debt from the defendant Jean-Charles had been reduced to $36,246.96 on October 4, 2005.[13] Of course, interest and other costs may accrue to the plaintiff in accordance with the terms of the note. The plaintiff may provide the court with updated evidence of the debt consistent with this opinion in the next phase of this trial." (Footnotes altered.)

Following the second phase of the bifurcated trial, the court issued an order on April 28, 2014, in which it found that the plaintiff was entitled to a judgment of strict foreclosure of 10 Carlin Street, and that the debt owed to the plaintiff by Jean-Charles was $69,544.49, which included accrued interest and costs. Attorney's fees in the amount of $81,826.26, along with an appraisal fee of $900 were added to the debt, for a total debt of $151,370.75. The court also found the fair market value of the property located at 10 Carlin Street to be $480,000. Law days then were set. This appeal followed.

I

The plaintiff first claims that the court abused its discretion when it applied the doctrine of equitable subrogation and reordered the priority of interest of the liens on 10 Carlin Street. Specifically, the plaintiff claims: "The defendant bank is not entitled to equitable subrogation because it had constructive notice of [the plaintiff's] mortgage." It explains: "[A]lthough there is a divergence between [our] Supreme Court and the Appellate Court as to whether equitable subrogation can be had despite constructive notice of a previously recorded interest, the more logical and persuasive reasoning is that constructive notice of preexisting interest outweighs any alleged windfall or undue advantage, and, this prevents the party with constructive notice from availing itself of equitable subrogation."

The defendant bank responds: "Constructive notice has never been a bar to the application of the doctrine of equitable subrogation by the Supreme Court. Hence, [the] plaintiff's reliance on [Appellate Court case law] is misplaced. Though [the] plaintiff indicates in [its] argument that constructive notice should be a determinative factor, if not the primary factor, in considering the application of equitable subrogation, the trial court pointed out [that] if such prevented the application of the doctrine, *it would be inconsistent with the Supreme Court's language in* [*Connecticut National Bank* v. *Chapman*, 153 Conn. 393, 216 A.2d 814 (1966)]." (Emphasis in original.)

We conclude that constructive notice of an interven-

ing interest in the property is not a per se bar to the application of the doctrine of equitable subrogation; rather, whether to apply this doctrine is left to the sound discretion of the trial court following a careful balancing of the equities in each particular case.

"A foreclosure action is an equitable proceeding. . . . The determination of what equity requires is a matter for the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *Rosenbilt* v. *Williams*, 57 Conn. App. 788, 792, 750 A.2d 1131, cert. denied, 254 Conn. 906, 755 A.2d 882 (2000). "When the trial court draws conclusions of law from its balancing of the equities, however, our review is plenary." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 543, 849 A.2d 777 (2004).

Before we address the plaintiff's claims, it is important to review the principles undergirding the doctrine of equitable subrogation. In mortgage law, "[a] fundamental principle is that a mortgage that is recorded first is entitled to priority over subsequently recorded mortgages provided that every grantee has a reasonable time to get his deed recorded." (Internal quotation marks omitted.) *Equicredit Corp. of Connecticut* v. *Kasper*, 122 Conn. App. 94, 97, 996 A.2d 1243, cert. denied, 298 Conn. 916, 4 A.3d 831 (2010). This principle is referred to as the first in time, first in right rule. See id. "The doctrine of equitable subrogation provides an exception to the first in time, first in right rule . . . ." Id.

"Subrogation is a doctrine which equity borrowed from the civil law and administers so as to secure justice without regard to form or mere technicality. . . . It is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which, in equity and good conscience, should have been discharged by the latter. It is a legal fiction through which one who, not as a volunteer or in his own wrong and where there are no outstanding and superior equities, pays the debt of another, is substituted to all the rights and remedies of the other, and the debt is treated in equity as still existing for his benefit." (Citation omitted; internal quotation marks omitted.) *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, 123 Conn. 232, 238, 193 A. 769 (1937).

"In numerous cases it has been held that one who advances money to discharge a prior lien on real or personal property and takes a new mortgage as security is entitled to be subrogated to the rights under the prior

lien against the holder of an intervening lien of which he was ignorant. . . . The intention of the parties to the transaction is the controlling consideration." (Citation omitted; internal quotation marks omitted.) *Rosenbilt* v. *Williams*, supra, 57 Conn. App. 793. Ultimately, as our Supreme Court has noted, "[t]he object of [legal or equitable] subrogation is the prevention of injustice." (Internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 269 Conn. 532.[14]

The Restatement (Third), Property, Mortgages § 7.6 (1997), on the topic of subrogation, provides a thorough explanation of this complicated doctrine. The Restatement rule provides: "(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

"(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:

"(1) in order to protect his or her interest;

"(2) under a legal duty to do so;

"(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

"(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interest in the real estate." Id., 508.

"Subrogation to a mortgage is usually of importance only when a subordinate lien or other junior interest exists on the real estate. If no such interest existed, the subrogee could simply sue on the obligation, obtain a judgment lien against the real estate, and execute on it. However, if an interest exists that is subordinate to the mortgage in favor of some other person, such a judgment lien would be inferior to it in priority and might have little or no value. In this setting, the subrogee wants more than a lien; he or she wants a lien with the priority of the original mortgage, and this is precisely what subrogation gives. The holders of intervening interests can hardly complain about this result, for they are no worse off than before the senior obligation was discharged. If there were no subrogation, such junior interests would be promoted in priority, giving them an unwarranted and unjust windfall." Restatement (Third), supra, § 7.6, comment (a), pp. 509–10.

The Restatement also explains the application of subrogation in the context of the refinancing of a mortgage loan: "A mortgage debtor may ask another person to discharge the debt. In some circumstances, the payor who does so is warranted in receiving, by subrogation, the benefit and priority of the mortgage paid. The most common context for this sort of subrogation is the 'refinancing' of a mortgage loan; that is, the payment of a loan with proceeds of another loan.

"Obviously, subrogation cannot be involved unless the second loan is made by a different lender than the holder of the first mortgage; one cannot be subrogated to one's own previous mortgage. Where a mortgage loan is refinanced by the same lender, a mortgage securing the new loan may be given the priority of the original mortgage under the principles of replacement and modification of mortgages . . . .[15]

"When a mortgage loan is paid by one who makes a new loan for that purpose, the payor will have the benefit of subrogation to the mortgage that was discharged only if the payor was promised repayment of the funds advanced and reasonably expected to receive a mortgage, with the priority of the discharged mortgage, on the real estate to secure that repayment. . . . Thus, a payor who makes a mere gift, or who makes a loan that is, by its terms, unsecured or secured with a lien of inferior priority, cannot claim subrogation, since that would provide the payor with an unwarranted windfall. . . . On the other hand, if the debtor promises to provide security in the real estate to the payor, but fails to do so, the payor is entitled to subrogation.

"Perhaps the case occurring most frequently is that in which the payor is actually given a mortgage on the real estate, but in the absence of subrogation it would be subordinate to some intervening interest, such as a junior lien. Here, subrogation is entirely appropriate, and, by virtue of it, the payor has the priority of the original mortgage that was discharged. This priority is often of critical importance, since it will place the payor's security in a position superior to intervening liens and other interests in the real estate. The holders of such intervening interests can hardly complain of the result, for it does not harm them; their position is not materially prejudiced, but is simply unchanged. . . .

"Under [the] Restatement . . . subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid. Ordinarily lenders who provide refinancing desire and expect precisely that, even if they are aware of an intervening lien. . . . A refinancing mortgagee should be found to lack such an expectation only where

there is affirmative proof that the mortgagee intended to subordinate its mortgage to the intervening interest." (Citations omitted.) Restatement (Third), supra, § 7.6, comment (e), pp. 519–20.

By way of illustration to comment (e), the Restatement sets forth an example, which is on point with the present case: "Mortgagor owns Blackacre subject to two mortgages held by Mortgagee-1 and Mortgagee-2 in order of priority. Both mortgages are recorded. Mortgagor approaches Mortgagee-3, a bank engaged in mortgage lending, and obtains a loan for the purpose of discharging Mortgage-1's mortgage. Mortgage-3 is not aware of the existence of Mortgage-2's interest, does not perform a title examination, and expects that its mortgage will have first priority. Mortgage-3 makes the loan and disburses the proceeds to pay and discharge in full Mortgagee-1's mortgage. Mortgagee-3 is entitled to be subrogated to Mortgagee-1's mortgage." Id., § 7.6, comment (e), illustration (23), p. 521.

The Restatement is careful to emphasize that the court considering equitable subrogation must be convinced that no injustice will result to the intervening lien holder before applying the doctrine: "Since the purpose of subrogation is to prevent unjust enrichment, it will not be granted where it would produce injustice. In virtually all cases in which injustice is found, it flows from a delay by the payor in recording his or her new mortgage, in demanding and recording a written assignment, or in otherwise publicly asserting subrogation to the mortgage paid. The delay may lead the holder of an intervening interest to take detrimental action in the belief that that interest now has priority." Id., § 7.6, comment (f), p. 522. In other words, the Restatement does not predicate application of this doctrine on the payor's knowledge of the intervening lien, but, rather, on the payor's expectations, the intention of the parties and the specter of prejudice that might inure to the intervening lienholder.

With these principles in mind, we turn to the claims in the present case. In this case, the parties assert that there is a divergence of law between our Appellate Court and our Supreme Court regarding the application of the doctrine of equitable or legal subrogation when the party seeking subrogation has constructive notice of the intervening lien. See also H. Winiarski, Jr., "Equitable Subrogation in the Context of Interests in Real Property: The Basics and the Areas Needing Authoritative Clarification," 85 Conn. Bar J. 231, 231 (2011) (examining "the significant, and often irreconcilable, divergence between existing Connecticut Supreme Court precedent on the doctrine and the manner in which it has been articulated and applied by the lower courts since the Supreme Court last addressed it nearly fifty years ago"). The defendant bank asserts that the

trial court properly applied the long-standing precedent of our Supreme Court, while the plaintiff asserts that the trial court improperly failed to follow more recent cases from the Appellate Court and, instead, relied on "outdated" cases from our Supreme Court.

We conclude, as did the trial court, that the cases from the Appellate Court, upon which the plaintiff relies, are distinguishable from the present case, and that the Supreme Court precedent is highly instructive and controls this case. We further conclude that the court did not abuse its discretion in applying the doctrine of equitable subrogation, despite the defendant bank's constructive knowledge of the plaintiff's lien.

The plaintiff relies on three Appellate Court cases to support its claim that the trial court abused its discretion when it applied the doctrine of equitable subrogation because the defendant bank had constructive notice of the intervening lien. The plaintiff contends that the Appellate Court has established a rule that constructive notice of the prior lien necessarily defeats the application of equitable subrogation. We disagree that this court has established such a per se rule and conclude that the application of the doctrine remains a matter of equity for the trial court's consideration even when the party seeking subrogation has constructive notice of the prior lien.

The three cases upon which the plaintiff relies, namely, *Deutsche Bank National Trust Co.* v. *DelMastro*, 133 Conn. App. 669, 679–81, 38 A.3d 166, cert. denied, 304 Conn. 917, 40 A.3d 783 (2012), *Equicredit Corp. of Connecticut* v. *Kasper*, supra, 122 Conn. App. 96–97, and *Independence One Mortgage Corp.* v. *Katsaros*, 43 Conn. App. 71, 73–74, 681 A.2d 1005 (1996), all have a critical feature that readily distinguishes them from the present case. Specifically, in each of those cases, the trial court had determined that equity did not support the application of the doctrine of equitable subrogation, and the Appellate Court, on appeal, determined that the trial court had not abused its discretion in so concluding.

Although these cases have some factual similarities to the present case, and, at least one author has concluded that one or more of these cases has eviscerated the precedent of our Supreme Court; see H. Winiarski, Jr., supra, 85 Conn. Bar J. 243–262; we are mindful, as this court stated in *DelMastro*, that "[r]elatively minor factual differences may, in the court's discretion, make a difference in the weighing of equities." *Deutsche Bank National Trust Co.* v. *DelMastro*, supra, 133 Conn. App. 678 n.4. In each of the cases relied on by the plaintiff, the trial court, after weighing the equities, determined that the doctrine should not be applied; we affirmed the court's exercise of its discretion. See also *Rosenbilt* v. *Williams*, supra, 57 Conn. App. 789–90 (affirming judgment of trial court, *applying* the doctrine of equita-

ble subrogation to reorder priorities of mortgages on subject property).

We next look to the precedent of our Supreme Court. In *Lomas & Nettleton Co.* v. *Isacs*, 101 Conn. 614, 615, 623, 127 A. 6 (1924), a case concerning equitable reinstatement,[16] the plaintiff refinanced its own mortgage, changing the interest rate and the terms of the mortgage. A second mortgage, held by another, also was released at that time. Id., 616. When releasing its first mortgage, however, the plaintiff failed to recognize that there also existed a third mortgage on the property, held by the defendant Herman Isacs. Id., 617. As a result, the plaintiff lost its first priority position. Id., 622.

On appeal, the Supreme Court explained that the plaintiff essentially had been renewing its previous mortgage and that it did not mean to extinguish that mortgage. Id., 619. The court stated: "The intention of the parties is the controlling consideration, and it is apparent . . . that the parties intended that the plaintiff should continue to have a first lien upon the premises . . . . It was only in a purely technical sense that the first mortgage was discharged of record and there can be no question as to the power and duty of a court of equity under such circumstances to lend its aid in effectuating the real intention of the parties, when that can be done without affecting in any way the rights of third parties." Id., 622. The court also stated: "The defendant Isacs is not in a position to take advantage of this mistake of the plaintiff's, whether it be considered a mistake of law or of fact. Unless the mistake is rectified, Isacs will obtain an unconscionable advantage. The correction of the mistake will leave [Isacs] in his original position and deprive him of no right to which he is justly entitled."[17] Id., 621.

In *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, supra, 123 Conn. 234–35, Michael DeDonato owned a piece of property on Huntington Road in Bridgeport on which he had obtained three mortgages, and he sought to refinance the property with a loan from the plaintiff Home Owners' Loan Corporation (Home Owners). DeDonato also owned a piece of property on Reservoir Avenue, on which the defendant Sears, Roebuck & Co. (Sears) had a mortgage. Id. While DeDonato was working with Home Owners on refinancing the Huntington Road property, Sears foreclosed on the Reservoir Avenue property and also obtained a deficiency judgment against DeDonato. Id. To secure that judgment, Sears placed an attachment lien on the Huntington Road property. Id., 235. Home Owners then had a title search performed on the Huntington Road property, but the search failed to show the properly recorded Sears' attachment lien. Id. Home Owners and DeDonato then completed the refinancing of the Huntington Road property, with Home Owners expecting to have a first mortgage on the property, but having

failed to discover the properly filed Sears lien. Id. Sears later filed a judgment lien to replace its attachment lien on the Huntington Road property, and it, then, realized that its lien had assumed first position. Id., 235–36. Sometime later, Home Owners brought a declaratory judgment action, seeking an equitable subrogation. Id., 236. The trial court granted the equitable relief and reordered the priorities of the liens on the Huntington Road property. Id. Sears then appealed. Id.

On appeal, our Supreme Court upheld the trial court's judgment insofar as it granted the equitable relief and reordered the priorities of the liens. Id., 247–48. In considering each of Sears' claims of error, the court first determined that Home Owners was not a volunteer in refinancing the property because it had an agreement with DeDonato to loan money in exchange for a mortgage. Id., 237–38. The court then determined that Home Owners had bargained for first position. Id., 238–40.

The court next considered Sears' claim that Home Owners should not be granted equitable relief because it had constructive notice of Sears' lien. Id., 240. The court stated: "[R]ecognition of the application of the principle of subrogation in this case would not violate the policy of this State that all persons dealing with real estate are entitled to rely upon the land records as disclosing the true state of the title to land; for it is a corollary to that principle that one who has actual notice of equitable rights not of record is nevertheless bound to recognize them." Id. The court explained that because Sears knew that Home Owners had made a mistake by failing to discover its lien, it could not avoid the equitable rights of Home Owners. Id.

The court continued: "A more serious question, growing out of the fact that the certificate of attachment was on record, concerns the effect upon the plaintiffs' rights of the constructive notice they thereby had of it when they took the mortgages involved in this action. If they were seeking relief of such a nature that a unilateral mistake was an essential element in their cause of action it might well be that the constructive notice they had of [Sears'] lien would stand in the way. . . . Subrogation is, however, a remedy which equity gives to aid in the enforcement of a right either legal or equitable, and, if there is a right, the application of the remedy does not require the existence of any other ground of equitable relief." (Citation omitted.) Id., 240–41. Our Supreme Court stated that the parties had intended that Home Owners have a first mortgage and that Sears knew, when it filed its lien, that it was taking an inferior position to the mortgages before it. Id., 241.

Furthermore, the court stated: "Whether . . . a [party] will be barred of remedy in equity against the effect of a mistake because of his negligence depends to a large extend upon the circumstances of the particular case. . . . The presumption that one taking a mortgage

upon land knows of all prior [e]ncumbrances of record affecting it certainly is no stronger than the presumption that one knows the law which determines his rights, yet, relief may be given in equity against mistakes of law. . . . The misconception under which the plaintiffs acted was one common to DeDonato and the holders of the released mortgages and the relief sought can in no way prejudice their rights. The situation is not one where the intention of all the parties should be defeated because the plaintiffs acted in disregard of [Sears'] lien, of which they had constructive notice." (Citations omitted.) Id., 242–43. Lastly, the court examined whether the equitable remedy would work an inequity to Sears and concluded that it would not. Id., 243–44.

Finally, we examine the most recent case in which our Supreme Court discussed equitable subrogation or reinstatement in a mortgage situation, which was released by the court in 1966. In *Connecticut National Bank* v. *Chapman*, supra, 153 Conn. 396, the defendants Robert and Theresa Nielsen owned premises that were mortgaged to the plaintiff, Connecticut National Bank (bank). The Nielsens then sold the premises to the defendants Loring and Toy Chapman, who assumed the bank's mortgage. Id. The Nielsens also loaned the Chapmans money and took a second mortgage on the premises, specifically subject to the bank's mortgage. Id. The bank received an insurance endorsement reflecting the Chapmans' second mortgage. Id.

When the Chapmans became delinquent on their property taxes, they sought another mortgage from the bank. Id., 396. The bank had an attorney perform a title search, but he did not discover the Nielsens' properly recorded second mortgage. Id. The bank then closed on the new mortgage, and its attorney gave the bank a certificate of title, which showed title to the premises in the Chapmans subject only to the new first mortgage and a public utility easement. Id. When the Chapmans defaulted on their mortgage to the bank, the bank began a foreclosure action. Id. The bank, then, "became aware of the existence of the Nielsens' mortgage, of which it had known but had negligently overlooked." Id. The Nielsens filed a counterclaim, and their mortgage was foreclosed, subject to the trial court's determination of the priorities of the mortgages. Id., 397.

Our Supreme Court in *Chapman* explained that equity required the court to examine the substance of the entire transaction and not simply its form. Id. On the basis of the facts in the case, the court stated: "There being no intention to release a first mortgage lien, its actual release for a momentary purpose should in equity permit a subsequent lienor, who has not been prejudiced thereby, to intervene and acquire priority. That equity will act to prevent such a result is clearly established by the great weight of authority. . . .

"One of the most common mistakes connected with

releases of mortgages occurs when the mortgage is renewed and the prior lien is released in ignorance of intervening rights. Ignorance in such a case is regarded in equity as equivalent to a mistake, and relief will be granted when there is no element of estoppel involved. . . . We have upheld the power of a court of equity to grant relief from the consequences of an innocent mistake, although the mistake was not unmixed with negligence, when the failure to do so would allow one to enrich himself unjustly at the expense of another. . . . Whether . . . a [party] will be barred of remedy in equity as against the effect of mistake because of his negligence depends to a large extent upon the circumstances of the particular case." (Citations omitted.) Id., 397–98.

The court then instructed: "If the circumstances show that there was no intent that the lien should be lost by the release of the original mortgage, and, if the intervening lienholder has not been prejudiced by any change in his status because of reliance on the release . . . relief should be granted." Id., 399. On the particular facts of the *Chapman* case, wherein the plaintiff bank had actual notice of the intervening Nielsens' lien, which it negligently overlooked, the court explained: "The plaintiff would not be entitled to the remedy it seeks if that would work an inequity to the Nielsens. Here, the only action the Nielsens took was, after being cited in as parties, to file a counterclaim seeking the foreclosure of their mortgage against the Chapmans, who failed to redeem. To deny relief to the plaintiff would result in the unjust enrichment of the Nielsens through an unexpected and undeserved windfall. A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Id.

A review of these Appellate and Supreme Court cases leads us to conclude that there certainly may be times when, on the particular facts of the case, constructive notice of an intervening lien would tilt the scales in favor of denying an equitable remedy such as subrogation. See *Deutsche Bank National Trust Co.* v. *DelMastro*, supra, 133 Conn. App. 678–79; *Equicredit Corp. of Connecticut* v. *Kasper*, supra, 122 Conn. App. 98–99; *Independence One Mortgage Corp.* v. *Katsaros*, supra, 43 Conn. App. 71. Nevertheless, constructive notice of such a lien, or actual notice for that matter, certainly does not bar the court, after properly weighing the equities of the particular case, from the application of an equitable remedy. See *Connecticut National Bank* v. *Chapman*, supra, 153 Conn. 393; *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, supra, 123 Conn. 232; *Lomas & Nettleton Co.* v. *Isacs*, supra, 101 Conn. 614; *Rosenbilt* v. *Williams*, supra, 57 Conn. App. 795; see also Restatement (Third), supra, § 7.6.

In the present case, the trial court examined the relevant cases from both the Appellate and Supreme Courts, and it then applied the principles expressed therein. The court found: "The plaintiff is only in its position of being first in time on the 10 Carlin Street property as a result of the mistake of the defendant bank's predecessors who, in fact, did negotiate and bargain for a first mortgage position on the 10 Carlin Street property, and, who, in fact, gave valuable consideration to obtain it. It would not be equitable to allow the plaintiff to obtain a benefit [for] which it did not bargain . . . at the expense of the defendant bank under all of these circumstances . . . ."

On appeal, the plaintiff claims that "[t]he defendant bank is not entitled to equitable subrogation because it had constructive notice of [the plaintiff's] mortgage," and "that constructive notice of preexisting interest outweighs any alleged windfall or undue advantage, and, this prevents the party with constructive notice from availing itself of equitable subrogation." After our thorough review of our prior case law, the Restatement (Third), supra, § 7.6, other pertinent articles, and cases from other states,[18] we are persuaded that the defendant bank's constructive notice of the plaintiff's prior intervening lien was not a per se bar to the court's application of the doctrine of equitable subrogation.[19] Accordingly, after fully considering the argument of the plaintiff, we are not persuaded that the court abused its discretion in applying this equitable doctrine.

II

The plaintiff also claims that the court abused its discretion when it reduced the amount of the mortgage the plaintiff held on 10 Carlin Street on the basis of the court's conclusion that there was a value to a quitclaim deed, previously held by the plaintiff, for the commercial property located at 18 Monroe Street. Specifically, the plaintiff argues: "As part of its ruling on the issue of equitable subrogation, the trial court found that the quitclaim deed delivered to [the plaintiff] in 2005 had a value of $205,000. . . . In so doing, the court rejected [the plaintiff's] argument that the quitclaim deed had no value because it was void as against public policy. . . . Furthermore, it relied upon this finding to reduce the debt owed by [the defendant] Jean-Charles to [the plaintiff]. . . . There was no basis in law or fact for the trial court's rejection of [the plaintiff's] position." The plaintiff also argues: "[H]ad [the plaintiff] attempted to enforce its supposed rights under the quitclaim deed, it would not have prevailed. As a matter of law, a court would conclude that the quitclaim deed operated to deprive JCE of its opportunity to redeem as to 18 Monroe St[reet] and [that the deed, therefore, was] void. Quite simply, the quitclaim deed . . . held no legal value." We are not persuaded that the court abused its discretion.

As set forth in part I of this opinion: "A foreclosure action is an equitable proceeding. . . . The determination of what equity requires is a matter for the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Rosenbilt* v. *Williams*, supra, 57 Conn. App. 792. "When the trial court draws conclusions of law from its balancing of the equities, however, our review is plenary." (Internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 269 Conn. 543.

The court in the present case reasoned: "[T]he plaintiff chose to sell the 18 Monroe Street property in a highly leveraged transaction. Knowing the risks involved in such a transaction it negotiated, demanded and received security for the debt due them from the purchaser. . . . [I]t took back a second mortgage to secure the debt on the property being sold (18 Monroe Street); in addition it demanded a quitclaim deed be executed and placed in escrow and it obtained a third mortgage on the buyer's personal residence. It received back and recorded the quitclaim deed approximately three and one-half years after the original transaction on October 4, 2005, when the property had a value of $670,000. It voluntarily assigned its second mortgage to its principals rather than [enforce] it.[20] Between the quitclaim deed and the assignment of the mortgage the plaintiff received substantial value toward the payment of the debt just as [it] had contemplated in obtaining those two items of security.

"The plaintiff argues that the court should not consider the transactions surrounding the quitclaim deed to be of any value because of Connecticut's public policy against the use of such quitclaim deeds executed at the time of a mortgage transaction to cut off an owner's equitable right of redemption. . . . While the court does not disagree with the plaintiff's general statement of the public policy against 'clogging' the equity of redemption, whether . . . that policy would have been invoked to bar the plaintiff's rights under the quitclaim deed in the case at bar, given all of the components of the original transaction, is an issue that is not before this court. . . . [T]he plaintiff cannot take the position that the court should ignore the quitclaim deed as against public policy when the plaintiff insisted that it be executed, retrieved it pursuant to the escrow agreement, recorded it, and successfully asserted its validity to the federal Bankruptcy Court [when it sought and received] relief from the automatic stay of proceedings. In fact the plaintiff received the benefit of all the security for the debt owed to it by the defendant Jean-Charles and JCE [for] which it had negotiated . . . when it engaged in the initial transaction for the sale and purchase of 18 Monroe Street. . . . Moreover, the

value of the 18 Monroe Street property was $670,000 at the time that the plaintiff recorded the quitclaim deed and assigned its second mortgage to its principals."

We conclude that the reasoning of the trial court in this case is persuasive and that the court did not abuse its discretion. The plaintiff demanded as partial security for the personal guarantees of Pascarelli and Bartolo on the First County loan and its $195,000 loan to the defendant Jean-Charles, JCE and Regina that a quitclaim deed for the 18 Monroe Street property be executed and delivered to the escrow agent and that such deed be held unless and until JCE defaulted on its promissory note to either the plaintiff or First County.

The present foreclosure case was commenced in April, 2005, after JCE defaulted as anticipated in the escrow agreement, and the quitclaim deed, thereafter, was duly recorded on the land records in October, 2005. The plaintiff also used its "ownership" of the 18 Monroe Street property in JCE's bankruptcy case. During this time, the plaintiff certainly was not expressing a policy concern that the quitclaim deed it was requiring, recording, and using to establish its "ownership" before the bankruptcy court was improper or unenforceable. On the basis of these facts, we are unable to conclude that the court, in this equitable proceeding, abused its discretion when it concluded that there was a monetary value to the quitclaim deed when the plaintiff filed it on the land records in October, 2005.

### III

The plaintiff also claims that the court erred when it assigned a value to 18 Monroe Street for 2005, without any evidence as to its value at that time. Specifically, it argues that the court "had before it no appraisal establishing the value of 18 Monroe [Street] in 2005 [and its] reliance upon appraisals from different dates was improper." The defendant bank argues that the court "had before it the best evidence that the parties provided as to [the] value of the . . . property . . . . At trial, three appraisals of the . . . property were made full exhibits: [A] 2002 appraisal which valued the property at $675,000 . . . [a] 2008 appraisal which valued the property at $668,000 . . . and the 2010 appraisal which [valued] the subject property at $480,000." It further argues that the court had "two appraisals of the commercial property from 2002 and 2008, which had a constant value of $670,000 . . . [and that the court properly] determin[ed] such was the value of the property on October 4, 2005, when [the] plaintiff recorded its quitclaim deed." We agree with the defendant bank.

"A foreclosure action is an equitable proceeding. . . . The determination of what equity requires is a matter for the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we

must make every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Rosenbilt* v. *Williams*, supra, 57 Conn. App. 792. Nevertheless, "[u]ltimately, the determination of the value of the property [is] a matter of opinion and depend[s] on the considered judgment of the [trial court], taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . .

"Accordingly, we review the court's findings under the highly deferential, clearly erroneous standard of review. [W]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Dept. of Transportation* v. *Cheriha, LLC*, 155 Conn. App. 181, 191–92, 112 A.3d 825 (2015).

Here, the plaintiff contends in its brief that there was no evidence before the court that would permit the court to assign a value to the 18 Monroe Street property for the year 2005. It argues, without citation to authority, that the court could not rely on appraisals from different years to determine the value of the property in 2005. During oral argument before this court, however, the plaintiff conceded that "there are appraisals around that time frame, give or take a few years, that may support [the court's finding of a value]. However, we believe the most reliable evidence as to the property—and its value—was when it was sold by First County Bank to an entity known as J.P. Asset, Inc., which was in 2008."

When making its determination as to the value of 18 Monroe Street at the time that the plaintiff recorded the quitclaim deed for that property, the court had before it a 2002 appraisal that had been prepared for First County Bank by William Kaszics and Fred A. LaGreca of Appraisal Services, LLC, which valued the 18 Monroe Street property at $675,000, as of March 25, 2002. The court also had before it an appraisal that had been prepared for the plaintiff by Richard P. Piazza and Jean T. Piazza of Premier Appraisal Group in 2008, which valued the 18 Monroe Street property at $668,000, as of October 22, 2008. Additionally, the court had a 2010 appraisal report prepared for J.P. Asset by Dominick Pastorello of D.P. Appraisal Services, valuing the property at $480,000 as of June 25, 2010.

The court also heard the testimony of various apprais-

ers, including Chris LaGreca, a general certified real estate appraiser. LaGreca testified that he had reviewed the Pastorello appraisal from 2010, and that there were inconsistencies in the report and several other issues of concern, which he put on the record for the court. LeGreca also testified that there was a dramatic downturn in the economy in 2008, and that there generally was an approximate 20 percent reduction in values in Norwalk as a result of the 2008 recession, but he could not speculate as to the reduction in value of 18 Monroe Street.

On the basis of the evidence before it, the court specifically found that "the value of the 18 Monroe Street property was $670,000 at the time that the plaintiff recorded the quitclaim deed and assigned its second mortgage to its principals. While the plaintiff argues the value of the 18 Monroe Street property was considerably less in 2005, [it] introduced no direct appraisal testimony to this effect and the court believes that the lessening of the value of the 18 Monroe Street property occurred substantially after 2005 as a result of its continued deterioration and significant market forces that occurred in late 2008."

On appeal, the plaintiff points to nothing in the record that persuades us that this finding was clearly erroneous, nor are we persuaded that the court assigned a value that purely was conjectural and devoid of any evidentiary support. Cf. *Thompson* v. *Orcutt*, 257 Conn. 301, 307 n.8, 777 A.2d 670 (2001) (outlining procedure used by trial court to determine equity in property several years before foreclosure commenced where plaintiff had unclean hands due to his false representations in bankruptcy case that had implications on foreclosure case: "Based on testimony at trial that the market value of the property subject to the [plaintiff's] mortgage in 1990 had been $147,200, the trial court used an annual depreciation rate of 4 percent, which was derived from the testimony of the plaintiff's expert appraiser, and found that the fair market value of the property during the first year of the plaintiff's bankruptcy case would have been approximately $135,000. The trial court noted that that figure was consistent with the testimony of the plaintiff's appraiser who estimated the value of the property in 1999 to be $103,000. Deducting $95,000, which represented the face amount of the two priority encumbrances, and disregarding the [a third] lien, which had been paid in full but not released, the trial court found that there had been $40,000 in equity in the property in 1992, [which was] more than enough to satisfy the full amount of the [plaintiff's] $25,000 . . . mortgage.")

Here, the court had before it evidence of the value of the Monroe Street property on various dates before and after the relevant 2005 date. It also had testimony explaining the 2008 economic downturn, which caused

property values to decline. On the basis of the evidence presented, the court assigned a value to the property. We are not persuaded that the court erred in doing so.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Also named as defendants in the trial court were Herns Jean-Charles, Regine F. Jean-Charles, Mortgage Electronic Registration System, Inc., Bank of America, Mutual Security Credit Unions, Inc., Gilbert Lebowitz, and Bernard Jacobson, all of whom were defaulted by the trial court. Martin J. Darby, Jr., was a nonappearing defendant before the trial court, and Columbia Taxi Company was removed as a defendant by the trial court; they are not parties to this appeal. The trial court granted a motion to substitute the Bank of New York Mellon, Trustee, as the defendant.

[2] For purposes of clarity, we also note that neither Pascarelli nor Bartolo, in their individual capacities, are parties to this case.

[3] "Pascarelli testified that he was quite interested in selling the property, in part, because his elderly father was involved in the maintenance and management of the property and he was concerned about adverse impacts to his father from a continuation of his father's involvement in the property. This may have given Pascarelli added incentive to sell the property beyond that of a typical seller."

[4] The trial court also stated that "[t]he testimony by the principals of the plaintiff was to the effect that the plaintiff owned 18 Monroe Street. The court notes that the grantors on the deed conveying 18 Monroe Street to JCE are Pascarelli and Bartolo. Whether there was a conveyance from the plaintiff to Pascarelli and Bartolo shortly before the closing or the witnesses were simply mistaken as to who the title holder of 18 Monroe Street was prior to the conveyance to JCE [was] not clear to the court."

[5] "See footnote [4]" of this opinion.

[6] The note apparently contains a scrivener's error. It specifically states that it "is secured by real property known as: 18 *Meadow* Street, Norwalk, Connecticut 06854 and 10 Carlin Street, Norwalk, Connecticut 06851." (Emphasis added.) The error has not been mentioned by any party on appeal, and the trial court did not mention it in its decision.

[7] JCE, the defendant Jean-Charles, and Regina also executed a hold harmless and indemnification agreement, in which they agreed that they would hold harmless Pascarelli and Bartolo until the $500,000 loan was paid in full and the mortgage released, and that they would indemnify Pascarelli and Bartolo for any loss, liability, damage and expense, including attorney's fees, suffered as a result of their guaranteeing the loan. The escrow agreement was a requirement contained in the hold harmless and indemnification agreement.

[8] The record also reveals that Pascarelli and Bartolo executed their personal guarantee of First County Bank's $500,000 loan to JCE at that time.

[9] For the sake of clarity, we note that the defendant Jean-Charles was not a party to the First County note and mortgage in his individual capacity. Rather, he acted only in his representative capacity, on behalf of his limited liability company, JCE, when he executed the note and mortgage with First County. We also mention that JCE has not been named a party in the present case, although its principal, the defendant Jean-Charles, has been named in his individual capacity.

[10] J.P. Asset is not a party to the present action.

[11] We note that the purchase and sale agreement was between the plaintiff and the defendant Jean-Charles. The defendant Jean-Charles, however, did not execute the note and mortgage, nor take title to 18 Monroe Street in his individual capacity. Rather, First County Bank executed a note and mortgage with JCE, to whom the plaintiff ultimately sold the property. See also footnotes 4 and 9 of this opinion.

[12] "No defendant is entitled to any credit or advantage based on the fact that J.P. Asset purchased a debt worth more than $400,000 for $400,000. First, J.P. Asset is a separate entity and there has been no evidence from which the court can conclude that a corporate veil should be pierced. Second, the acquisition of the First County debt was based on an arm's length transaction, and J.P. Asset was entitled to the full value of the asset [that] it purchased regardless of what it paid for that asset."

[13] "The plaintiff cannot escape this finding by asserting that the quitclaim deed was also subject to a second mortgage that had been assigned to Pascarelli and Bartolo. Because the mortgage and quitclaim deed were both

security for the same debt, the assignment of the mortgage to its principals was a voluntary relinquishing of that security and an election to proceed with the quitclaim deed. To discount the value of the quitclaim deed by the value of the mortgage that its principals still controlled would be to allow a double recovery for the same debt."

[14] "The law has recognized two types of subrogation: conventional; and legal or equitable. 73 Am. Jur. 2d 599, Subrogation § 2 (1974 and 1995 Sup.). . . . Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . . By contrast, [t]he right of [legal or equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect." (Internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 269 Conn. 532. In the present case, only equitable subrogation is at issue.

[15] For the Restatement rule and discussion of equitable reinstatement of replacement mortgages, which generally applies the rules of equitable subrogation, see Restatement (Third), supra, § 7.3; see also H. Winiarski, Jr., "Equitable Subrogation in the Context of Interests in Real Property: The Basics and the Areas Needing Authoritative Clarification," 85 Conn. Bar J. 231, 237 n.15 (2011).

[16] See footnote 12 of this opinion.

[17] In carefully reviewing the *Isacs* case, we have taken note that the court also stated that plaintiff had neither factual notice nor constructive notice of the Isacs' lien. *Lomas & Nettleton Co.* v. *Isacs*, supra, 101 Conn. 619. The court did not explain, in light of the facts, why the plaintiff was not charged with constructive notice except to say that the plaintiff merely meant to extend and continue, rather than replace, the previous mortgage. Id.

[18] See, e.g., *East Boston Savings Bank* v. *Ogan*, 428 Mass. 327, 331–33, 701 N.E.2d 331 (1998) (declining to adopt bright line rule that would nullify availability of equitable subrogation when subrogee had degree of knowledge concerning existence of intervening mortgage, and affirming judgment granting subrogation despite plaintiff bank's constructive knowledge of intervening lien); *JP Morgan Chase Bank, N.A.* v. *Banc of America Practice Solutions, Inc.*, 209 Cal. App. 4th 855, 861–62, 147 Cal. Rptr. 3d 287 (2012) (affirming judgment granting equitable subrogation to plaintiff bank, who refinanced first and second mortgage, despite bank's constructive notice of prior lien, because bank bargained for first position, prior lienholder bargained for junior position, and junior lienholder could not demonstrate prejudice as all parties received exactly what they bargained for by application of equitable subrogation).

[19] We pause to state that we recognize that institutional lenders routinely are involved in these types of transactions and that they generally have significant experience and resources at their disposal. *Bankers Trust Co.* v. *United States*, 29 Kan. App. 2d 215, 221–22, 25 P.3d 877 (2001) (acknowledging Restatement approach but declining to follow it). Indeed, we also are mindful that professional lenders often hire their own title examiners, and, if the professional lender chooses, even by mistake or negligence, to lend in spite of a cloudy title, the balance of the equities in that circumstance may well dictate that the professional lender bear the risk that flows from such a decision. See *Deutsche Bank National Trust Co.* v. *DelMastro*, supra, 133 Conn. App. 675–78. Nevertheless, whether the lender should be barred from invoking the doctrine of equitable subrogation when it has constructive notice of an intervening lien is a decision left to the sound discretion of the trial court after a proper balancing of the equities in each individual case. See *Connecticut National Bank* v. *Chapman*, supra, 153 Conn. 397–98; *Deutsche Bank National Trust Co.* v. *DelMastro*, supra, 676. Because our Supreme Court has recognized this doctrine and applied its principles in prior case law despite the mistake or negligence of the lender or its title examiner, we adhere to that law and leave the adoption of a per se rule to that court.

[20] The effect of assigning the mortgage to Pascarelli and Bartolo, without assigning the debt, is not before us.